Parker G. Stinar, Esq. (pro hac vice)
Patrick C. Lannen, Esq. (pro hac vice)
**STINAR LANNEN, PLLC**
280 W. Maple Rd., Ste. 200
Birmingham, Michigan 48009
Tel: (248) 565-2690
Fax: (248) 565-2691
Email: Parker@StinarLannenLaw.com
Patrick@StinarLannenLaw.com

D. Todd Mathews
*Pro Hac Granted, MDL 3199*
**BAILEY GLASSER, LLP**
210 W. Division St., Bldg. 2
Maryville, IL 62062
Phone: (618) 418-5180
Fax: (304) 342-1110
tmathews@baileyglasser.com

Lee A. Floyd
*Pro Hac Granted, MDL 3199*
**FLOYD LAW**
626 East Broad Street,
Suite 300
Richmond, Virginia 23219
Phone: (804) 529-0000
Fax: (804) 529-0009
lee@floydpc.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE: APPLE AIRTAG MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>JANE S.W. DOE - SLBGFL - 45<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | MDL No. 3199<br>Case No. 5:26-md-03199-NW<br>Member Case No. __________<br>Hon. Noël Wise<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Negligence (California Law)<br>2. Strict Products Liability—Design Defect (California Law)<br>3. Products Liability—Failure to Warn (California Law)<br>4. UCL—Unlawful Prong (California Law)<br>5. UCL—Unfair Prong (California Law) |

6. Ohio Product Liability Act—Design Defect (Ohio Rev. Code Ann. §§ 2307.71–.80) (in the alternative)
7. Ohio Product Liability Act—Inadequate Warning (Ohio Rev. Code Ann. §§ 2307.73, 2307.76) (in the alternative)
8. Ohio Product Liability Act—Nonconformance with Representation (Ohio Rev. Code Ann. §§ 2307.73, 2307.77) (in the alternative)

**DEMAND FOR JURY TRIAL**

Plaintiff Jane S.W. Doe - SLBGFL - 45 ("Plaintiff"), through counsel, brings this Complaint against Defendant Apple Inc. She files it directly in In re Apple AirTag Marketing, Sales Practices and Products Liability Litigation, MDL No. 3199, under the Court's direct-filing order. She alleges as follows, on personal knowledge as to herself and on information and belief as to all other matters.

## INTRODUCTION

1. Defendant Apple Inc. ("Apple") must be held accountable for its continuing failure to protect the public from being stalked with its product, the Apple AirTag® ("AirTag").

2. In 2021, Apple released the AirTag. It knew the device could—and would—be bought and used by abusive, controlling people to track, coerce, and endanger their victims.

3. Apple also knew in 2021 that adequate safeguards were not yet in place. It released the AirTag anyway. Since then, Apple has played catch-up. It has quietly added features that still fail to curb the dangers of a product that is now more than five years old.

4. Plaintiff is one of the people Apple's choices left exposed. In August 2022, her abusive ex-husband ("Stalker") used a hidden Apple AirTag in her car in Ohio to track her. The AirTag was hidden inside a cigarette pack.

5. Plaintiff carried an iPhone. Apple's alert came only after the AirTag had been in her car for several days. The Stalker soon found her.

6. Stalker beat Plaintiff in the head with a crowbar. Every bone in her face was broken. She suffered three skull fractures, four brain bleeds, and a traumatic brain injury, and she spent a month in the hospital.

7. Apple's design, warning, and release decisions were made at its headquarters in Cupertino, California. Those decisions give rise to liability under California law. Under California law, Apple's acts and omissions constitute negligence, strict products liability for design defect and failure to warn, and violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. In the alternative, and to the extent Ohio law governs any issue, Apple's acts and omissions give rise to the Ohio Product Liability Act claims pleaded below. Plaintiff seeks compensatory, punitive, exemplary, restitutionary, injunctive, and other relief.

## PARTIES

8. Plaintiff is an adult individual. She is domiciled in, and a citizen of, the State of Ohio. She resides in New Carlisle, Ohio. She intends to remain in Ohio indefinitely.

9. Defendant Apple Inc. is a corporation organized under the laws of the State of California. Its principal place of business is in Cupertino, California. Apple is therefore a citizen of California for purposes of 28 U.S.C. § 1332(c)(1). Apple is an American multinational technology company. Among its consumer electronics is the AirTag. Apple oversees all aspects of the AirTag, including its design, manufacture, marketing, technical support, and maintenance. Apple also designs, operates, and maintains the Find My network through which AirTags function, and the iOS unwanted-tracking alerts on which persons like Plaintiff depend. Apple is a manufacturer and seller of the AirTag.

## JURISDICTION, VENUE, AND DIRECT FILING

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Complete diversity exists. Plaintiff is a citizen of Ohio. Apple is a citizen of California. No defendant shares Plaintiff's citizenship.

11. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff seeks compensatory damages for catastrophic physical injuries, including facial and skull

fractures, brain bleeds, a traumatic brain injury, and seizures; past and future medical expenses; past lost earnings and loss of earning capacity; severe mental anguish, emotional distress, anxiety, depression, and post-traumatic stress disorder; fear for her physical safety; loss of her sense of autonomy and security; and related losses. She also seeks punitive or exemplary damages. Together, these damages exceed the jurisdictional threshold.

12. This Court has general and specific personal jurisdiction over Apple. Apple is incorporated in California and has its principal place of business in this District. Apple is at home here.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Apple resides in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here. On information and belief, Apple designed the AirTag, designed its anti-stalking safeguards, decided to release it, and decided how to warn the public from its Cupertino headquarters. Plaintiff chooses this District as the venue for this action for all purposes, including trial.

14. Plaintiff files this Complaint directly in this District and in MDL No. 3199, as permitted by Pretrial Order No. 1 (the "Direct Filing Order"). Under the Direct Filing Order, Plaintiff designates the Northern District of California as the proper venue for this action.

15. Venue in this District does not depend on the Direct Filing Order. Because Apple resides here and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here, Plaintiff could have filed this action in this District independent of MDL No. 3199. Plaintiff does not designate any other district as her home or transferor venue.

16. **Intradistrict Assignment.** Under Civil L.R. 3-2(c) and 3-5(b), this action relates to MDL No. 3199. It should be assigned to the Division and the Judge presiding over that proceeding.

## CHOICE OF LAW

17. Plaintiff contends that California law governs her claims. Plaintiff pleads her California-law claims first, in Counts I through V. She pleads her Ohio-law claims, in Counts VI through VIII, in the alternative.

18. California law should govern Plaintiff's claims. This action was filed in this District, and California's choice-of-law rules therefore apply. The conduct Plaintiff challenges occurred in California. On information and belief, Apple's officers and managing agents in Cupertino made the decisions to release the AirTag with safeguards Apple knew were inadequate; to keep selling it after tens of thousands of stalking reports; to deliver safety fixes through owner-dependent firmware; and to describe stalking incidents to the public as "rare." California has a strong interest in regulating the conduct of a California corporation that designs dangerous products in California and sells them nationwide.

19. In the alternative, Ohio law should govern the Ohio-law counts to the extent the Court determines that Ohio has the greater interest in any issue. Plaintiff was tracked in Ohio and suffered her injuries there.

20. Plaintiff does not concede that any conflict exists between her home-state law and California law on any issue. If a true conflict exists, Plaintiff reserves the right to brief the choice of law at the appropriate stage.

## GENERAL ALLEGATIONS

21. On April 2, 2024, ITV News in the United Kingdom aired a report on AirTag stalking.[1] In response, Apple stated: "We have identified even more ways we can update AirTag safety warnings and help guard against further unwanted tracking."

22. This promise of future, unspecified action came too late for Plaintiff. By then, Apple's product had already been used to track her. The time for adequate safety warnings and

---

[1] ITV News, *AirTags Becoming "Weapon of Choice of Stalkers" as GPS Tracker Cases Rocket by 317%*, YouTube (Apr. 2, 2024), https://www.youtube.com/watch?v=TBhYdgt1FhE.

better protections was April 2021, before the AirTag's release. It is unconscionable for Apple to keep on the market a product it knows is still unsafe.

23. Apple has always known that any safeguards it built into AirTags would only, in Apple's own words, "deter as opposed to prevent malicious use."

24. Each year, an estimated 13.5 million people are stalked in the United States. Nearly one in three women and one in six men experience stalking at some point in their lives.[2]

25. Apple's AirTags have become a critical—and shameful—part of this problem. From 2021 forward, Apple has received over 40,000 stalking reports, at times averaging 1,000 complaints per month.

26. Stalking takes many forms. Most often it involves unwanted, repeated behavior that would cause fear in a reasonable person. Whatever the method, the common thread is the fear it creates in the victim.

27. That fear erodes a victim's autonomy and disrupts daily life. One in eight employed stalking victims misses work because of the victimization. More than half of those lose more than five days of work. One in seven stalking victims moves as a result.[3]

28. Stalking victims suffer much higher rates of depression, anxiety, insomnia, and social dysfunction than the general population. Most report a fear of not knowing what will happen next. Stalking is a significant risk factor for homicide in abusive relationships.

29. No one disputes any of this. Stalking is a serious, well-documented phenomenon. It ruins lives, and it ends them.

30. Knowing all this, Apple released a small, concealable device. It allows anyone with an iPhone to continuously and precisely track another person's location for $29.00.

---

[2] Stalking Prevention, Awareness, and Resource Ctr. (SPARC), *Stalking Fact Sheet* 1 (2019), https://www.stalkingawareness.org/wp-content/uploads/2019/01/SPARC_StalkngFactSheet_2018_FINAL.pdf.

[3] Katrina Baum et al., U.S. Dep't of Just., Bureau of Just. Stat., *Stalking Victimization in the United States* 1 (Jan. 2009), https://www.justice.gov/archive/ovw/docs/bjs-stalking-rpt.pdf.

31. Before releasing the AirTag in April 2021, Apple knew it would be used as a stalking tool. Apple even designed certain features to reduce that risk. But Apple released the product knowing those features could not prevent stalking.

32. At release, Apple knew the AirTag's anti-stalking measures were inadequate for at least these reasons:

a. The iPhone notification system alerted users to an unknown AirTag only after three days—an eternity in a stalking situation;

b. Android users received no notifications at all, leaving roughly half of the smartphone-using population unprotected;

c. The AirTag's speaker, meant to alert a victim to an unknown AirTag, was quiet, easily muffled, and easily defeated, and instructions for disabling it were widely available online; and

d. The AirTag's small, light, and concealable form made it trivially easy to hide in a victim's belongings or vehicle.

33. Apple made a calculated business decision to release the AirTag anyway. It put market timing and profits ahead of human safety.

34. The consequences were swift and predictable. Soon after the April 2021 release, reports poured in from people who had been stalked, tracked, and terrorized with AirTags.

35. Stalkers have used AirTags to track victims to their homes, workplaces, and places of refuge. AirTags have been hidden in wheel wells, under bumpers, in purses, in jacket pockets, and in children's backpacks.

36. AirTags have enabled abusers in domestic situations to monitor and control the people closest to them. Many victims had no idea they were being tracked until it was too late.

37. The consequences have been as severe as possible. Multiple murders have occurred in which the killer used an AirTag to track the victim.

38. With its "stalker-proof" protections exposed as inadequate, Apple has spent five years scrambling. Most of these failures persist. Apple keeps reacting to harm its product has

caused instead of preventing it. As one commentator put it: "You wouldn't allow a car to come to mass-market without having vigorous testing, so why are we allowing smart tech to just be released and then fixing safety features later?"[4]

## FACTUAL ALLEGATIONS

### A. How the AirTag Works

39. Apple introduced the AirTag in April 2021 as a standalone product.[5] It is about the size of a U.S. quarter. It is a tracking beacon marketed to help consumers find objects such as keys or purses.

40. The AirTag uses Bluetooth Low Energy ("BLE") technology. It broadcasts a rotating identifier. Nearby Apple devices detect that signal and relay the AirTag's location to Apple's servers through the "Find My" network.

41. The Find My network turns the world's Apple devices into a mesh tracking network. Any powered-on, connected iPhone, iPad, or Mac can relay an AirTag's location. There are over two billion active Apple devices. The network works silently, without the knowledge or consent of the device owners who relay the data.

42. As a result, an AirTag's location can be updated virtually anywhere—including on the streets, parking lots, and driveways of DeGraff, Ohio.

### B. Apple Knew the AirTag Would Be Used to Stalk

43. Before the AirTag's release, commentators, journalists, and domestic violence advocates publicly warned that small, cheap Bluetooth trackers would be used as stalking tools.

44. Apple was well aware of these concerns. Apple anticipated that the AirTag would be used for unwanted tracking.

---

[4] Ellie Fry, *Inside Chilling Rise of AirTag Stalking as Apple Device Is Branded 'Gift to Abusers'*, The Mirror (Apr. 24, 2023), https://www.mirror.co.uk/tech/inside-chilling-rise-airtag-stalking-29746435.

[5] Press Release, Apple Inc., *Apple Introduces AirTag* (Apr. 20, 2021), https://www.apple.com/newsroom/2021/04/apple-introduces-airtag/.

45. Apple described the AirTag's anti-stalking features as designed to "deter as opposed to prevent" malicious use. That was an admission that Apple knowingly released the product with inadequate safeguards.

46. Apple launched the AirTag with only minimal safeguards. These were (a) an audible alert that sounded after three days away from the owner's iPhone, and (b) a notification that alerted iPhone users—but not Android users—to an unknown AirTag traveling with them.

47. These measures were woefully inadequate. Three days without an alert gives a stalker ample time to learn a victim's home, workplace, and routine.

48. About half of U.S. smartphone users use Android devices. At launch, they had no way to detect an AirTag tracking them. Apple released a "Tracker Detect" app for Android in December 2021, eight months after launch. The app required users to start a scan manually.

49. In June 2021, Apple announced it would cut the time before an unknown AirTag sounds from three days to a random interval between 8 and 24 hours. In February 2022, Apple announced further changes. Even an 8-to-24-hour interval gives a stalker ample time to locate a victim's home, workplace, and routine.

50. Apple's piecemeal approach—half-measures adopted only after public outcry—shows that Apple has consistently put sales ahead of safety.

### C. The AirTag's Safeguards Fail Even iPhone Users

51. Apple's protections fail even the iPhone users they were built for. Plaintiff is one of them.

52. The iOS "Item Safety Alerts" feature relies on algorithms that often fail to detect tracking in time. An unknown AirTag must travel with the victim for some period before any alert issues. During that window, the stalker can watch the victim's every move.

53. The alerts are easy to miss. They look like ordinary push notifications. They can be buried, swiped away, or simply overlooked. Users who turn off Location Services for privacy reasons also lose these alerts. Apple does not explain this.

54. An alert, standing alone, does not tell the victim where the AirTag is. To find it, the victim must rely on the AirTag's sound. That sound is deficient in at least four ways:

a. It is too quiet. The alert reaches about 60 decibels at most. A purse, fabric, or a car's exterior can muffle it;

b. It is not distinct. The chime sounds like countless other device alerts;

c. It is not continuous. It stops before the person can find the device; and

d. It is easily disabled. The AirTag keeps working after the speaker is removed, and online tutorials explain how.

55. Even when a victim finds an AirTag, her options are limited. She must take physical possession of it and remove its battery. Finding it may be impossible or costly. Dismantling it can compromise evidence. And the stalker can simply deploy another AirTag.

56. Safety updates to AirTag firmware are not pushed automatically to the victim. They depend on the AirTag's owner—the stalker—to install them.

**D. Feasible Safer Alternative Designs Existed**

57. At all relevant times, safer alternative designs existed. Each would have prevented or significantly reduced the risk of AirTag stalking without substantially impairing the product's utility for finding lost items. Each was economically and technologically feasible when the AirTag left Apple's control, using existing or reasonably achievable scientific knowledge. Among other things, Apple could have:

a. alerted a tracked person within minutes, not hours or days;

b. designed a louder, distinct, continuous, non-removable, and tamper-resistant speaker, and rendered the AirTag non-functional if the speaker were disabled;

c. enabled precise, on-demand location of an unknown AirTag by the person it is traveling with, so the victim could find a concealed device without police help;

d. required identity verification or account linking before activation, creating accountability and deterring anonymous stalking;

e. automatically disabled tracking when an AirTag stays near a non-owner's device for a defined period;

f. required periodic owner re-authentication to prevent indefinite passive tracking;

g. released simultaneous, equivalent, automatic detection for Android users at launch; and

h. made the AirTag larger and more conspicuous, so it could not be easily hidden under a vehicle's bumper.

58. Apple chose not to adopt any of these designs.

### E. Apple Consciously Disregarded the Danger

59. Only weeks after the AirTag's release, Apple CEO Tim Cook was briefed on press reports describing the AirTag as "a new means of inexpensive, effective stalking." Cook was told that Apple could weather the storm: "At this time, we are not seeing this narrative gain steam in media or on social…." Apple chose to manage the narrative instead of the danger.

60. Apple's officers, directors, and managing agents, including Mr. Cook, authorized, directed, or ratified the decision to release and keep selling the AirTag without adequate safeguards. They did so with knowledge of the ongoing harm.

61. Apple publicly called AirTag stalking "rare." Its internal data showed more than 40,000 unwanted-tracking reports in the three years after release, ending in April 2024. Apple also knew that most law-enforcement requests it received about AirTags concerned stalking.

62. Apple has also failed to support victims. Its legal-process guidelines state that AirTag pairing history is available for only up to 25 days. Victims who seek protection or prosecution are often left without the evidence they need.

63. The AirTag sells for about $29. Apple has sold tens of millions. Before the AirTag, effective GPS trackers were expensive, needed monthly subscriptions, and were hard to hide. The AirTag removed those barriers.

64. The harm is ongoing. Apple continues to sell AirTags with safeguards that remain inadequate.

## PLAINTIFF'S EXPERIENCE WITH AIRTAGS

65. At the time of the events described below, Plaintiff lived in Ohio. The tracking described below occurred in and around DeGraff, Ohio, in Champaign County.

66. Plaintiff was formerly married to a man who is referred to here as the "Stalker." He was abusive.

67. In or around August 2022, Stalker used an Apple AirTag hidden in Plaintiff's car to track her location without her consent.

68. Plaintiff did not consent. She did not know the AirTag was there.

69. Plaintiff used an Apple iPhone. The AirTag was in her car for a few days before Apple's notification came.

70. On or about August 22, 2022, the day after Plaintiff received an Apple notification, Stalker found her. Stalker located her using the AirTag's location data.

71. Stalker assaulted Plaintiff. He struck her in the head with a crowbar repeatedly. Stalker used the AirTag to find, monitor, threaten, and assault her.

72. Plaintiff was hospitalized for a month.

73. After Plaintiff left the hospital, she kept receiving Apple notifications. The AirTag was still hidden in her car and still tracking her. Its sound had not led her to it. She and her boyfriend at the time searched her car. She found the AirTag hidden inside a cigarette pack.

74. Plaintiff reported the tracking to law enforcement in Champaign County, Ohio, and to the county prosecutor.

75. Plaintiff would have discovered the AirTag far sooner, or Stalker would have been deterred from using it, if Apple had adopted the safer alternative designs and warnings described above. A prompt alert, a way to locate the device, and a louder sound would have exposed the AirTag before Stalker could use it to find her.

76. As a direct and proximate result, Plaintiff suffered catastrophic injuries. Every bone in her face was broken. She suffered three skull fractures, four brain bleeds, and a traumatic brain injury. She now has seizures, anxiety, depression, and post-traumatic stress disorder. She has

received medical treatment, including at OhioHealth Grant Medical Center in Columbus, Ohio, as well as therapy and medication.

77. Plaintiff was out of work for six months. She can no longer work because of her injuries, including post-traumatic stress disorder, and has had to apply for disability.

**STATUTE OF LIMITATIONS AND TOLLING**

78. Under Ohio law, an action based on a product liability claim and an action for bodily injury must be brought within two years after the cause of action accrues. Ohio Rev. Code Ann. § 2305.10(A). Plaintiff learned she was being tracked in or around August 2022.

79. On December 5, 2022, a putative class action was filed against Apple in the U.S. District Court for the Northern District of California. It is captioned *Hughes v. Apple, Inc.*, No. 3:22-cv-07668-VC (the "*Hughes* Action"). The Hughes Action asserted claims on behalf of a proposed nationwide class of people who were tracked, stalked, or otherwise harmed through AirTags. It arose from the same course of conduct alleged here: Apple's release and continued sale of the AirTag without adequate safeguards against unwanted tracking.

80. Less than four months of the two-year limitations period had run when the Hughes Action was filed. Plaintiff was tracked without her knowledge or consent by a concealed AirTag, and from December 5, 2022, she fell within the putative class asserted in the *Hughes* Action. She did not opt out. She was not a named plaintiff. She relied on the named plaintiffs to press the class's claims.

81. On March 9, 2026, the Honorable Vince Chhabria entered an order denying class certification in the Hughes Action. (*Hughes* Action, ECF No. 287.)

82. Under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Once tolled, the limitations period "remains tolled for all members of the putative class until class certification is denied." Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 354 (1983).

83. Ohio applies the same rule to class actions filed in federal court.

84. The limitations period was therefore suspended from December 5, 2022, until March 9, 2026. Plaintiff filed this action within the time that remained under the applicable Ohio and California limitations periods as tolled.

85. In the alternative, any limitations period was tolled under applicable equitable-tolling principles and the discovery rule. Apple received timely notice of Plaintiff's claims through the *Hughes* Action, which arose from the same conduct alleged here. Apple has not been prejudiced in gathering evidence or defending against those claims. Plaintiff acted reasonably and in good faith in relying on the *Hughes* Action to protect her rights.

**COUNT I**

**NEGLIGENCE**

**(California Law)**

86. Plaintiff repeats and realleges all preceding paragraphs.

87. Under California negligence principles, Apple owed Plaintiff a duty of reasonable care in the design, testing, marketing, distribution, and post-sale support of the AirTag.

88. Each relevant consideration supports that duty. Harm to people like Plaintiff was highly foreseeable. The certainty that such people would be injured was great. The connection between Apple's conduct and Plaintiff's injuries was close. Moral blame attaches to Apple's knowing release of an inadequately safeguarded product. And public policy favors preventing the harm.

89. As the manufacturer that designed the AirTag and placed it into the stream of commerce, Apple had a duty to avoid exposing foreseeable users and bystanders—including persons foreseeably tracked by the device—to unreasonable risks of harm. That duty included designing the AirTag so it would not create an unreasonable risk of use as an instrument of criminal stalking. Apple specifically anticipated and acknowledged that risk before launch.

90. Apple breached its duty. Among other things, Apple released the AirTag knowing its safeguards would only "deter as opposed to prevent" stalking; designed alerts that issue only

after a tracking device has traveled with the victim for hours or days; designed a speaker too quiet, too brief, and too easily muffled to lead a victim to a concealed device; failed to adopt the feasible safer alternative designs alleged above; failed to adequately test the AirTag's anti-stalking features in real-world concealment scenarios, such as placement under a vehicle's bumper; and continued to sell the AirTag after learning of tens of thousands of stalking reports, while publicly minimizing the problem. It rushed AirTags to market and kept selling them without timely, reliable detection of unwanted tracking for iPhone users like Plaintiff. It also gave tracked persons no reliable way to locate a hidden AirTag.

91. Apple's breach was a substantial factor in causing Plaintiff's injuries. The Stalker's criminal use of the AirTag was not an unforeseeable superseding cause. It was the very harm that Apple anticipated, was warned about, and designed its safeguards—inadequately—to prevent. The AirTag's inadequate safeguards substantially enhanced the Stalker's ability to track Plaintiff covertly, including to the place where he found and attacked her. Those safeguards did not work as designed in Plaintiff's case. The AirTag traveled with her for days before any alert reached her. The alert did not show her where the device was. The device's sound did not lead her to it before Stalker found her, or in the weeks that followed. She found it only by searching her car by hand.

92. As a direct and proximate result of Apple's negligence, Plaintiff suffered the injuries described above and is entitled to compensatory damages.

93. Apple acted with malice, oppression, or fraud within the meaning of Cal. Civ. Code § 3294. Its officers, directors, and managing agents knew of the probable dangerous consequences of the AirTag's design and consciously chose not to avoid them. Plaintiff is entitled to punitive damages under California law.

**COUNT II**

**STRICT PRODUCTS LIABILITY: DESIGN DEFECT**

**(California Law)**

94. Plaintiff repeats and realleges all preceding paragraphs.

95. Apple designs, manufactures, distributes, and sells AirTags. Apple placed the AirTag used to track Plaintiff into the stream of commerce.

96. The AirTag is defective in design under the consumer-expectations test. Plaintiff pleads this theory in the alternative and to preserve it. It failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable way. Consumers may know that tracking devices can be used. But an ordinary consumer would reasonably expect that Apple had built effective safeguards to detect and prevent unauthorized tracking, particularly given Apple's promotion of the AirTag's anti-stalking features. An ordinary consumer would expect Apple to warn her promptly, whatever phone she carried, when an unknown AirTag was hidden on her vehicle, and to help her find it. The AirTag failed those expectations.

97. The AirTag is also defective in design under the risk-benefit test. Its foreseeable risk of facilitating stalking outweighs the benefits of its design. Practical, technically feasible alternative designs existed that would have prevented or significantly reduced Plaintiff's injuries. They include immediate, reliable, and tamper-resistant alerts; alerts that disclose every unknown AirTag traveling with the tracked person; precise on-demand location by the tracked person; and design features that reduce covert placement and continued tracking.

98. The design defect was a substantial factor in causing Plaintiff's injuries. The Stalker's criminal use of the AirTag was not an unforeseeable superseding cause. It was the very harm the AirTag's anti-stalking safeguards were designed—and failed—to prevent. Apple's admission that its safeguards would only "deter as opposed to prevent" malicious use confirms that Apple anticipated and accepted the risk of exactly this conduct.

99. As a direct and proximate result of the AirTag's defective design, Plaintiff suffered the injuries described above and is entitled to compensatory damages. Apple's conscious disregard of the known safety risks constitutes malice, oppression, or fraud under Cal. Civ. Code § 3294. Plaintiff is entitled to punitive damages under California law.

**COUNT III**

**PRODUCTS LIABILITY: FAILURE TO WARN**

**(California Law)**

100. Plaintiff repeats and realleges all preceding paragraphs.

101. Apple designed, manufactured, distributed, and sold the AirTag used to track Plaintiff.

102. When the AirTag left Apple's possession, it posed known or knowable risks. Those risks included covert tracking of non-consenting persons and the failure of Apple's alerts to notify tracked persons like Plaintiff in time, including Android users, or to help them locate the device. Apple knew of these risks, or could have known of them in light of the information available to it at the time of manufacture and distribution. That information included its own pre-launch assessment that its safeguards would only "deter as opposed to prevent" malicious use.

103. These risks presented a substantial danger when the AirTag was used in an intended or reasonably foreseeable way. Ordinary consumers, and people like Plaintiff who could be tracked by an AirTag, would not have recognized them.

104. Apple failed to adequately warn of these risks or to instruct the public on how to detect and guard against unwanted tracking. Among other things, Apple failed to provide timely alerts to people being tracked; failed to provide alerts that are persistent, distinct, and accompanied by a sound loud and continuous enough to locate a concealed device; failed to instruct tracked persons how to locate an AirTag hidden on or under a vehicle; failed to disclose that disabling Location Services would also disable unknown-AirTag alerts; and failed to accurately disclose the scope of AirTag stalking, which Apple publicly called "rare." Apple also failed to act as a reasonable manufacturer would have acted, after sale, once it learned of tens of thousands of stalking reports.

105. Apple's failure to warn was a substantial factor in causing Plaintiff's injuries. Had Apple given adequate warnings and instructions, Plaintiff would have followed them. She would have found the AirTag in her car before Stalker could use it to find her.

106. As a direct and proximate result of Apple's failure to warn, Plaintiff suffered the injuries described above and is entitled to compensatory damages. Apple's conscious disregard of the known risk also entitles Plaintiff to punitive damages under Cal. Civ. Code § 3294.

**COUNT IV**

**VIOLATION OF THE UNFAIR COMPETITION LAW: UNLAWFUL PRONG**

**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**

107. Plaintiff repeats and realleges all preceding paragraphs.

108. The Unfair Competition Law ("UCL") prohibits any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17200.

109. Apple engaged in business acts and practices in California. On information and belief, Apple designed the AirTag and its safeguards, decided to release and keep selling it, and decided how to warn the public at its Cupertino headquarters.

110. Apple's conduct is unlawful. It violates Cal. Civ. Code § 1714(a), which provides that "[e]veryone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person." As alleged above, Apple's conduct breached that statutory duty and also constitutes negligence and products liability under California law. Each of these independent violations serves as a predicate for the UCL's unlawful prong.

111. Apple's conduct also offends the policy and purpose of the California Invasion of Privacy Act, Cal. Penal Code §§ 630 et seq., as further alleged in Count V. Apple designed, released, and kept selling the AirTag without adequate safeguards against unconsented location tracking. It failed to give Plaintiff, an iPhone user, a timely and reliable way to detect and locate the AirTag tracking her. In doing so, Apple aided, and was a substantial factor in enabling, the electronic tracking of Plaintiff's location and movements by a third party without her consent.

112. Plaintiff has standing under Cal. Bus. & Prof. Code § 17204. She suffered injury in fact and lost money or property as a result of Apple's conduct, including out-of-pocket costs for medical care, therapy, and medication, and lost earnings during the six months she could not work.

113. Under Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Apple from engaging in the unlawful business practices alleged here in connection with the sale of AirTags, and restitution to the extent permitted by law. Plaintiff's legal remedies are inadequate to stop Apple's continuing sale of AirTags with inadequate safeguards. She seeks equitable relief in the alternative to her claims for damages.

**COUNT V**

**VIOLATION OF THE UNFAIR COMPETITION LAW: UNFAIR PRONG**

**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**

114. Plaintiff repeats and realleges all preceding paragraphs.

115. Apple's business practices are unfair. Releasing and continuing to sell AirTags with safeguards Apple knew were inadequate is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The gravity of the harm far outweighs any utility of Apple's conduct.

116. Apple's business practices are also unfair because they undermine public policy tethered to specific constitutional and statutory provisions. Those provisions include the California Invasion of Privacy Act, Cal. Penal Code §§ 630 et seq., and the right to privacy in the California Constitution, Cal. Const. art. I, § 1.

117. Apple's business practices are further unfair because (1) the injury to consumers is substantial; (2) the injury is not outweighed by any countervailing benefit to consumers or competition; and (3) consumers could not reasonably have avoided it. Plaintiff could not avoid a danger hidden on her vehicle that her phone did not timely disclose or help her locate.

118. Reasonably available alternatives existed to further Apple's legitimate business interests. Apple's practices are a continuing course of unfair competition because Apple continues to sell AirTags.

119. Plaintiff has standing under Cal. Bus. & Prof. Code § 17204. She suffered injury in fact and lost money or property as a result of Apple's conduct, including out-of-pocket costs for medical care, therapy, and medication, and lost earnings during the six months she could not work.

120. Under Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Apple from engaging in the unfair business practices alleged here in connection with the sale of AirTags, and restitution to the extent permitted by law. Plaintiff's legal remedies are inadequate to stop Apple's continuing sale of AirTags with inadequate safeguards. She seeks equitable relief in the alternative to her claims for damages.

**COUNT VI**

**OHIO PRODUCT LIABILITY ACT: DEFECT IN DESIGN**

**(Ohio Rev. Code Ann. §§ 2307.71–.80; Pleaded in the Alternative)**

121. Plaintiff repeats and realleges all preceding paragraphs.

122. She pleads this Count in the alternative to Counts I through V, as Federal Rule of Civil Procedure 8(d)(2) and (3) permit, to the extent the Court determines that Ohio law governs.

123. The Ohio Product Liability Act governs claims that seek compensatory damages from a manufacturer for physical injury, emotional distress, or property damage arising from a product's design, marketing, or warnings. The Act is intended to abrogate common-law product liability claims. Plaintiff therefore pleads her Ohio product claims under the Act.

124. Apple is a manufacturer because it designs, produces, and assembles the AirTag and its component systems. The AirTag is a product.

125. A manufacturer is liable if its product was defective in design, the defect proximately caused harm, and the manufacturer designed or produced the actual product.

126. The AirTag was defective in design. When it left Apple's control, its foreseeable risks exceeded its benefits. Those risks include covert, nonconsensual tracking of people. Their nature and magnitude are severe. Tracked persons have little awareness of them. The design makes that harm likely. And the design is more dangerous than a reasonably prudent consumer would expect.

127. Practical and technically feasible alternative designs were available. Those alternatives would have prevented or reduced Plaintiff's harm without substantially impairing the AirTag's usefulness for finding lost items.

128. The design defect proximately caused Plaintiff's harm, including physical injury and serious emotional distress. Stalker's use was foreseeable. It was the precise risk Apple anticipated.

129. Apple's misconduct manifested a flagrant disregard of the safety of persons who might be harmed by the AirTag. Plaintiff seeks punitive damages to the extent permitted by

130. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged above.

**COUNT VII**

**OHIO PRODUCT LIABILITY ACT: INADEQUATE WARNING OR INSTRUCTION**

**(Ohio Rev. Code Ann. §§ 2307.73, 2307.76; Pleaded in the Alternative)**

131. Plaintiff repeats and realleges all preceding paragraphs.

132. She pleads this Count in the alternative to Counts I through V, as Federal Rule of Civil Procedure 8(d)(2) and (3) permit, to the extent the Court determines that Ohio law governs.

133. A product is defective due to inadequate warning or instruction at the time of marketing if the manufacturer knew or should have known about a risk and failed to give the warning a manufacturer exercising reasonable care would have given.

134. A product is also defective due to inadequate post-marketing warning or instruction if, after the product left the manufacturer's control, the manufacturer knew or should have known about the risk and failed to give a reasonable post-marketing warning.

135. Apple knew, before and after release, that AirTags would be used to covertly track people. Apple failed to give tracked persons timely, persistent, and understandable warnings. Apple also failed to give clear instructions on how to find and disable a hidden AirTag.

136. The risk was not open and obvious to Plaintiff. It was not a matter of common knowledge. The AirTag was hidden and tracking her without her knowledge.

137. Apple's inadequate warnings and instructions proximately caused Plaintiff's harm. Adequate warnings would have alerted Plaintiff sooner and helped her find the device before Stalker could continue tracking her.

138. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged above.

**COUNT VIII**

**OHIO PRODUCT LIABILITY ACT: NONCONFORMANCE WITH REPRESENTATION**

**(Ohio Rev. Code Ann. §§ 2307.73, 2307.77; Pleaded in the Alternative)**

139. Plaintiff repeats and realleges all preceding paragraphs.

140. She pleads this Count in the alternative to Counts I through V, as Federal Rule of Civil Procedure 8(d)(2) and (3) permit, to the extent the Court determines that Ohio law governs.

141. A product is defective if it did not conform, when it left the manufacturer's control, to a representation made by the manufacturer. A "representation" is an express representation of a material fact concerning the character, quality, or safety of a product.

142. Apple expressly represented that the AirTag was designed to discourage unwanted tracking and included built-in protections to alert people who were being tracked.

143. The AirTag did not conform to those representations. Its alerts were delayed, absent, or limited by device type. Its sound was too quiet or too easily defeated to lead a tracked person to a hidden device.

144. A product may be defective for nonconformance even though its manufacturer did not act fraudulently, recklessly, or negligently.

145. The nonconformance proximately caused Plaintiff's harm. Ohio's Act displaces common-law negligence product claims, so Plaintiff pleads her negligence-based theories through Counts VI through VIII.

146. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment against Apple and award the following relief:

a. Judgment in Plaintiff's favor on the causes of action in this Complaint, including, in the alternative, the home-state causes of action;

b. Compensatory damages, including for past and future physical injuries, pain and suffering, medical expenses, lost earnings and loss of earning capacity, and mental anguish and emotional distress, and the cost of any related treatment, in an amount to be proven at trial and exceeding $75,000;

c. Punitive damages under Cal. Civ. Code § 3294 and, in the alternative, exemplary or punitive damages under applicable home-state law, in an amount to be proved at trial;

d. Restitution under Cal. Bus. & Prof. Code § 17203 to the extent permitted by law;

e. Reasonable attorney's fees under Cal. Civ. Proc. Code § 1021.5 and any other applicable law;

f. Pre-judgment and post-judgment interest as permitted by law;

g. Costs of suit; and

h. Such other relief as the Court deems just and proper.

Dated: November 4, 2026

Respectfully submitted,
**STINAR LANNEN, PLLC**

By: /s/ Patrick Lannen
Parker G. Stinar, Esq. (pro hac vice forthcoming)
Patrick C. Lannen, Esq. (pro hac vice)

D. Todd Mathews
*Pro Hac Granted, MDL 3199*
BAILEY GLASSER, LLP

Lee A. Floyd
*Pro Hac Granted, MDL 3199*
FLOYD LAW

Counsel for Plaintiff

**DEMAND FOR JURY TRIAL**

Under Federal Rule of Civil Procedure 38(b) and Civil L.R. 3-6, Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: November 4, 2026

Respectfully submitted,
**STINAR LANNEN, PLLC**

By: /s/ Patrick Lannen
Parker G. Stinar, Esq. (pro hac vice)
Patrick C. Lannen, Esq. (pro hac vice)

D. Todd Mathews
*Pro Hac Granted, MDL 3199*
BAILEY GLASSER, LLP

Lee A. Floyd
*Pro Hac Granted, MDL 3199*
FLOYD LAW

Counsel for Plaintiff